IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE NETHERLANDS INSURANCE
COMPANY, PEERLESS INSURANCE
COMPANY,                                    17cv341
                                            ELECTRONICALLY FILED

      Plaintiffs,

        v.

BUTLER AREA SCHOOL DISTRICT,
DALE R. LUMLEY *Ph.D*,

      Defendants.

**Memorandum Opinion on Cross-Motions for Judgment on the Pleadings (docs. 21, 22 and 24)**

## I.      Introduction

This is a declaratory judgment action[1] brought by two insurance companies, The

Netherlands Insurance Company ("Netherlands") and Peerless Insurance Company ("Peerless"),[2]

hereinafter, where appropriate, collectively referred to as "the Insurers," against Butler Area

School District ("BASD") and Dale R. Lumley, Ph.D. ("Dr. Lumley")(Superintendent of

BASD), hereinafter, where appropriate, collectively referred to as "the Insureds." Doc. 1. The

Insurers seek a declaration from this Court that, under the Insurance Policies issued to the

Insureds, they have no duty to defend and/or to pay any judgment against the Insureds in a

related toxic tort class action lawsuit filed before this Court, captioned *Jillian Tait, et al. v. Butler*

*Area School District*, et al., No 2:17-cv-00182 (the "Tait litigation"). The Insureds filed Answers

and Counterclaims also seeking a declaratory judgment that the Policies at issue require a duty to

---

[1] The action was brought on the basis of diversity of citizenship. Therefore, the Court will apply Pennsylvania law where appropriate, as the Policies contain language setting forth endorsements applying Pennsylvania law, and the parties apply Pennsylvania law in their Briefing.
[2] The Netherlands and Peerless are now part of the Liberty Mutual Group.

defend/indemnify, and that the Insurers have breached their duties under the terms of the applicable Policies. Doc. 16, 17.

Judging from the four corners of the Second Amended Complaint in the Tait litigation,[3] and finding in favor of coverage where ambiguities in the Policies exist, this Court finds that Netherlands has a duty to defend the Insureds in the Tait litigation, and that Peerless has an excess defense obligation in the Tait litigation.

Accordingly, this Court will GRANT the Insureds' Motions for Judgment on the Pleadings (docs. 21 and 22), and DENY the Insurers' Motion for Judgment on the Pleadings (doc. 24).[4]

## II.    **Standard of Review**

The parties have filed Cross-Motions for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c).   Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he/she is entitled to judgment as a matter of law.   Rule 12(b)(6) provides the standard of review applicable to motions for judgment on the pleadings and motions to dismiss.   The Court is permitted to consider, in addition to the allegations of the Complaint, "documents that are attached or submitted with the complaint, . . .  and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

Thus, in deciding a motion filed in accordance with Rule 12(c), a Court must accept the factual allegations as true and draw all reasonable inferences presented in the pleadings in the

---

[3] Although the Second Amended Complaint in the Tait litigation was not provided of record in this case, the Court may take judicial notice of these public documents.   Doc. 28 in 17-cv-00182.
[4] The Court confines its analysis to whether there is a duty to defend, as the issue of indemnification is not yet ripe. The Court will stay and administratively close this case pending the conclusion of the Tait litigation.

light most favorable to the plaintiff. *Erickson v. Pardus*, 554 U .S. 89, 93–94 (2007); *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004). If the facts alleged by the plaintiff are sufficient to "raise a right to relief above the speculative level," such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or a motion for judgment on the pleadings, *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991).

### III.    Background Facts/Procedural History

#### A.    Procedural History/Interplay of Facts as Alleged in Tait Litigation and Instant Case

On February 7, 2017, the Tait litigation was instituted before this Court at civil action 17-cv-00182, against BASD and Dr. Lumley, alleging a three (3) count Class Action Complaint sounding in state law negligence (not based upon diversity of citizenship), medical monitoring, and a federal and state constitutional violation of right to bodily integrity (under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Article I, § 1 of the Constitution of the Commonwealth of Pennsylvania). BASD tendered the defense of the Tait litigation to the Insurers (through Liberty Mutual Insurance) on or about February 8, 2017.

By letters dated February 17, 2017, the Insurers[5] advised the Insureds that they would not participate in the defense of the Insureds in connection with the original Complaint filed in the Tait litigation, or pay any amounts to satisfy any settlement achieved or judgment rendered in that litigation. Doc. 1-6 and 1-7. After the First Amended Complaint was filed in the Tait litigation, the Insurers reiterated their coverage denial.

---

[5] The letters were sent by Liberty Mutual on behalf of Netherlands and Peerless, as they are now part of the Liberty Mutual Group. Doc. 31 at 18.

It is important to note that in each version of the Complaint in the Tait litigation, Plaintiffs have alleged lead and/or copper consumption by the students at the Summit Elementary School within the BASD. The Complaint in the Tait litigation has been amended twice, with consent of the parties (with the exception of the Insurers who are not parties to the Tait litigation), and with leave of court. While the original Complaint in the Tait litigation alleged primarily factual allegations of lead consumption, it also averred copper consumption as well on at least four occasions (see doc. 1 at ¶¶ 11, 22, 65 and 72a). In any event, the number of references to injury due to copper is irrelevant to the current analysis.

The First Amended Complaint, filed on April 7, 2017, added many new factual allegations regarding Plaintiffs' copper consumption (see doc. 18 at ¶ 1, 13, 14, 15, 19, 20, 21, 22, 23, 24, 26, 27, 41, 42, 48, 72, 79, 81, 83, 84, 90), as well as three counts of vicarious liability, civil aiding and abetting, accomplice liability under the Second Restatement of Torts § 876, and civil conspiracy. Doc. 18. It also added new defendants Mary Wolf (assistant superintendent of schools of BASD), and Glenn Terwilliger (maintenance director at BASD), both employed by BASD, and any claims against them fall under the Policies at issue.

The Second Amended Complaint added numerous factual allegations regarding lead and/or copper consumption by the students at Summit Elementary School between August 15, 2016 and January 20, 2017. Doc. 28. More specifically, the Second Amended Complaint alleges the following (emphasis added for specific mention of lead and/or copper):[6]

---

[6] While the Insurers allege "artful pleading" by the Plaintiffs in the Tait litigation in an effort to support a finding of the duty to defend, this Court notes that *all* versions of the Complaint in the Tait litigation contain allegations regarding copper exposure. While the original Complaint did not contain the word "dispersal," the Amended Complaint upon which the original Motions for Judgment on the Pleadings were based contained the word "dispersal." The Second Amended Complaint has removed the word "dispersal," and instead uses the word "movement," "at a slow rate of time" (doc. 28 at ¶ 20 at 17-cv-00182), which is consistent with the more specific factual allegations of the Amended Complaint, by describing the process by which lead and copper enter into the water from pipes.

11. On information and belief, prior to the 2016/2017 school year, the Defendant District installed and/or incorporated a chlorinator into the Summit Elementary School's potable water system, which was intended to and did pump chlorine into the school's water supply in order to purify said water.

12. On information and belief, Defendant District failed to properly operate and/or use the aforesaid chlorinator as it was designed and/or intended.

13. Resultantly, for some time prior to the 2016/2017 school year, the Summit Elementary water system contained excessive concentrations of chlorine, which accelerated the corrosion of the water system and which resulted in a slow and continuous movement of dangerous levels of **lead and copper** into the Summit Elementary water system.

14. On information and belief, and at all times relevant hereto, Defendant District failed and/or chose not to adequately and/or properly monitor and/or maintain the water quality conditions of Summit Elementary school.

15. On information and belief, and at all times relevant hereto, Defendant District failed and/or chose not to adequately and/or properly monitor and/or maintain the following parameters, all or some of which may contribute to accelerated corrosion and/or movement of lead and/or copper into the water system: Alkalinity, pH, and DIC, Corrosion inhibitors, Hardness (calcium and magnesium), Buffer Intensity, Dissolved oxygen, Oxidation reduction potential, Ammonia, chloride, and sulfate, Natural organic matter, and/or Iron, aluminum, and manganese.

16. On information and belief, and at all times relevant hereto, Defendant District failed and/or chose not to adequately and/or properly monitor and/or maintain the copper piping in its water system in such a way that it was properly grounded and/or minimized the flow of electrical current, which accelerated the corrosion of the water system and which resulted in a slow and continuous movement of dangerous levels of **lead and copper** into the Summit Elementary water system.

17. Prior to the 2016/2017 school year, Defendant District conducted mandatory, routine tests on Summit Elementary School's water supply by and through an independent testing company.

18. Summit Elementary School's water supply is drawn from a well and proceeds through underground pipes and various fixtures and into the school, all of which are located on Defendant District's property and are under Defendant District's care, custody, and/or control.

19. At all relevant times the Defendants knew or should have known that **lead and copper enters drinking water when service pipes that contain**

**lead and/or copper corrode over time**, with the rate and extent of dissemination of these heavy metals dependent upon such factors as:

    a. the chemistry of the water (acidity and alkalinity) and the types and amounts of minerals in the water,
    b. the amount of **lead or copper** it comes into contact with,
    c. the temperature of the water,
    d. the amount of wear in the pipes,
    e. how long the water stays in pipes, and
    f. the presence of protective scales or coatings inside the plumbing materials.

20. On information and belief, the movement of the dangerous levels of **lead and copper** into the Summit Elementary water system occurred continually, but at a slow rate over time.

21. Shortly after August 15, 2016, the Defendants received test results from the aforesaid testing company, which indicated the presence of **both lead and copper** levels far in excess of acceptably safe water standards.

22. The aforesaid test results were much higher than acceptable and safe standards, which demonstrated unequivocally to the Defendants that the drinking water at Summit Elementary was adulterated and posed a direct danger to anyone who drank it, especially the school's students.

23. The Defendants made a conscious and intentional decision to neither warn the students of this dangerous condition nor take any appropriate steps to fix the dangerous condition so as to protect Representative Plaintiff and all other similarly situated students from the dangers related thereto.

24. The affirmative actions of the Defendants created a dangerous environment, to-wit, a school full of poisonous drinking water that none of the students were aware of, for Representative Plaintiff and all other similarly situated students.

25. At all relevant times hereto, the Defendants knew that **lead and/or copper** respectively can cause serious health problems if too much enters the body from drinking contaminated water.

26. At all relevant times hereto, the Defendants knew that **lead and copper** can cause damage to the brain, kidneys and other major organs and systems and can interfere with the production of red blood cells that carry oxygen to all parts of the body.

27. At all relevant times hereto, the Defendants knew or should have known that lead and copper exposure poses the greatest risk of harm to children.

28. At all relevant times hereto, the Defendants knew or should have known that ingestion of **excess copper in drinking water can lead to copper toxicity, otherwise known as copperiedus.**

29. At all relevant times hereto, the Defendants knew or should have known that **copper toxicity or copperiedus can lead to vomiting, anemia, hematemesis, osteoporosis, decrease in the number of white blood cells, hypotension, melenia, coma, jaundice, damage to the liver and kidneys, damage to the neurological and endocrine systems causing symptoms such as tingling and loss of sensation in the feet and hands mood swings, irritability, depression, fatigue, confusion and difficulty focusing**.

30. At all relevant times hereto, the Defendants knew or should have known that ingestion of excess lead can cause abdominal pain, weight loss, sluggishness and fatigue, constipation, headaches, memory problems, infertility, intellectual disability, anemia, hearing problems, joint and muscle pain, mood disorder, seizures, coma, and/or death.

31. At all relevant times hereto, the **Defendants knew or should have known that the central nervous system effects and otherwise of lead and/or copper respectively on children are irreversible and thus inevitably cause permanent and chronic injury**.[1]

32. At all relevant times hereto, the Defendants knew or should have known that by drinking the water at Summit Elementary School, which was contaminated with poisonous levels of **lead and/or copper**, the students would be caused to suffer some and/or all of the harms averred herein.

33. By law, the Defendants were required to implement an "Action Plan" in response to the aforesaid dangerous **lead and/or copper** levels they knew existed in the Summit Elementary School's water supply.

34. In fact, the Defendant Terwilliger, with oversight from Defendant Lumley, contacted the Pennsylvania Department of Environmental Protection (DEP) to review its obligations.

35. Under the circumstances as herein described, the Defendants were required to warn of the dangerous conditions and immediately stop the use of all drinking water outlets within Summit Elementary until the source of the **lead and copper** contamination was found and the **lead and copper levels** were reduced to safe levels.

36. Despite the aforesaid knowledge, the Defendants never told any of the affected class members, Representative Plaintiff and the students of Summit Elementary, that the drinking water within the school was known to contain dangerous levels of **lead and/or copper**.

37. At all relevant times hereto, the Defendants allowed and/or created a dangerous condition to exist on the property/premises of Summit Elementary School consisting of drinking water contaminated with toxic elements as described herein, which posed a direct threat to the health and wellbeing of anyone who drank it and in particular children.

38. At the aforementioned time and place and for some time prior thereto, the Defendants had notice and/or knowledge of the aforementioned dangerous condition, or, in the exercise of reasonable care, should have had notice and knowledge of the aforementioned dangerous condition.

39. At the aforementioned time and place and for some time prior thereto, the Defendants realized or should have realized, that the dangerous condition posed an unreasonable risk of harm to invitees like Minor Plaintiff, Jillian Tait and all other similarly situated individuals.

40. At the aforementioned time and place and for some time prior thereto, the Defendants expected, or should have expected, that invitees, like Minor Plaintiff, would not discover or realize the danger, or would have failed to protect themselves against it.

41. At the aforementioned time and place, the Defendants failed to exercise reasonable care to protect invitees like Minor Plaintiff and all other similarly situated individuals against the danger and/or remediate the dangerous condition.

42. Between August 15, 2016 and January 20, 2017, Plaintiff and all other similarly situated individuals did drink and/or were caused to ingest the toxic water as described herein.

43. As a direct and proximate result of the foregoing, Plaintiff and all other similarly situated individuals were caused to sustain injuries and damages more specifically set forth hereafter.

44. At all times relevant hereto, the Defendants had a responsibility to maintain the Summit Elementary School in a condition free and clear of toxic water.

45. At all times relevant hereto, the Defendants had a responsibility to warn invitees like Plaintiff and all other similarly situated individuals that the

drinking water within the school was contaminated with toxic levels of various elements as described herein.

46. In fact, the Defendants intentionally delayed notifying Representative Plaintiff and all other members of the class of the dangerous condition which lurked in the drinking water until it finally mailed a notification letter dated January 20, 2017. A true and correct copy of this letter is attached hereto as Exhibit "A".

47. On information and belief, the only reason that the Defendants eventually notified Representative Plaintiff and all other members of the class of the dangerous condition was because of the diligent work of concerned citizen and Butler attorney Leland Clark, who obtained the DEP test results through various Right to Know and Freedom of Information requests.

48. Shockingly, despite its gross delay in alerting the Summit Elementary Students of the toxic water they had been unknowingly exposed to for the past several months, the Defendants chose not to offer any type of adequate medical testing, monitoring and/or treatment for the children in order to determine the extent to which they may have been harmed and/or required medical treatment and/or therapy.

Doc. 28 at 17-cv-00182.

On March 15, 2017, the Insurers filed the instant lawsuit seeking a declaration from this Court that they have no duty to defend and/or indemnify the Insureds because the Insurance Policies at issue exclude coverage. The Court conducted a Status Conference/Initial Case Management Conference (ICMC) in this case on April 4, 2017, and the ICMC in the Tait litigation on June 5, 2017. Numerous Motions to Dismiss are currently pending in the Tait litigation.

A briefing schedule in the instant lawsuit on the pending Motions was set forth at the April 4, 2017 ICMC; however, following the filing of the Second Amended Complaint in the Tait litigation (doc. 33), Supplemental Briefing was ordered by this Court to be completed by June 2, 2017 in the instant lawsuit.[7]

---

[7] The Insurers filed a Motion, titled "for Supplemental Briefing," wherein it sought that the Court essentially disallow Plaintiffs in the Tait litigation from filing the Second Amended Complaint. The Court finds that it would

### B.  **Insurance Policies**

#### 1.  **The Netherlands Policy[8]**

Netherlands issued a Commercial Package policy to BASD which was in effect from July 1, 2016 to July 1, 2017,[1] and which included Commercial General Liability ("CGL") coverage (the "Netherlands Policy").  Doc. 1-2 (Policy Number CBP 814483).  The Insuring Agreement to the CGL Coverage Part of the Netherlands Policy states:

> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1. Insuring Agreement**
>
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

The Netherlands Policy contains an endorsement entitled "EXCLUSION – LEAD LIABILITY," which states, in relevant part, that the insurance does not apply to:

> **1.** "Bodily injury", . . . arising, in whole or in part, either directly or indirectly out of the . . . inhalation, ingestion, absorption, use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials; . . .

The CGL Coverage Part of the Netherlands Policy also contains a pollution exclusion,

---

be inappropriate and unfair to do so under these circumstances, and therefore, with the filing of the Motion to Amend the Complaint (doc. 30 at 17-cv-00182), the Court granted said Motion of Plaintiffs in the Tait litigation and entered an Order in this case denying as moot the Motion (incorrectly titled Motion for Supplemental Briefing), while providing for Supplemental Briefing to be completed by June 2, 2017.  Although the Court had planned to issue a ruling on this declaratory judgment action before the ICMC in the Tait litigation, the filing of the Second Amended Complaint in the Tait litigation, and the filing of Supplemental Briefing thereon by both parties in this case on June 2, 2017, necessarily delayed a decision thereon.  Doc. 35 and 36.

[8] The Netherlands Policy is the primary policy and the Peerless Policy is an umbrella policy.  There are several different layers of coverage including Commercial General Liability (CGL), School Leaders Errors and Omissions (SLEO), Pollution Liability (PL), but  only the CGL applies here.

which provides, in relevant part, as follows:

> This insurance does not apply to:
>
> **f. Pollution**
>
> **(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>
> **(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. . .

The term "pollutants" is defined in the CGL Coverage Part of the Netherlands

Policy as follows:

> **15**. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Doc. 1-2 through Doc. 1-4.

### 2. **The Peerless Policy**

Peerless issued a Commercial Umbrella insurance policy (the "Peerless Policy") to

BASD which was also in effect from July 1, 2016 to July 1, 2017. Doc. 1-5 (Policy No. CU

8117683). The language of the Insuring Agreement of the Peerless Policy is as follows:

> We will pay on behalf of the "insured" those sums in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies. We shall have the right and duty to defend the insured against any claim or "suit" seeking damages to which this insurance applies. . . .

The "Defense And Expense of Claims And Suits" provision in the Peerless Policy states,

in relevant part, as follows:

> **a. Defense, Investigation And Settlement**

(1) We shall have the right and duty to defend the insured against any claim or "suit" seeking damages to which this insurance applies when:

**(a)** Such damages are not covered by "scheduled underlying insurance" or "other underlying insurance"; or

\*　　　\*　　　\*

However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. . . .

The Peerless Policy includes pollution and lead exclusions, which state, in relevant part, that the insurance does not apply to:

**i.    Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time; . . .

**u.    Lead**

**(1)** "Bodily injury", . . . arising, in whole or in part, either directly or indirectly out of the . . . inhalation, ingestion, absorption, use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials; . . .

[Doc. 1-5 at 34](), 38 and 43.

## IV.    <u>Discussion</u>

### A. <u>Duty to Defend Is Broad</u>

In a determination regarding whether an insurer has a duty to defend, the Court must look "solely to the allegations of the Complaint in the underlying action." *Ramara, Inc. v. Westfield Ins. Co.,* 814 F.3d 660, 678 (3d Cir. 2016)(quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.,* 908 A.2d 888, 896 (Pa. 2006)).  If the operative Complaint avers facts which support a recovery covered by the Policy, the coverage is triggered and the insurer

has a duty to defend until such time that the claim is confined to recovery that the policy does not cover. *Gen'l Acc. Ins. Co. of Am. v. All*en, 692 A.2d 1089, 1095 (Pa. 1997). Keeping in mind that the averments of the operative Complaint must be liberally construed in favor of the insured, *USX Corp. v. Adriatic Ins. Co.,* 99 F.Supp.2d 593, 611 (W.D. Pa. 2000), the Court also notes that the duty to defend is broader than the duty to indemnify. *Kvaerner*, 908 A.2d at 896.

Under Pennsylvania law, "when an insured tenders multiple claims to an insurer for defense, the insurer is obligated to undertake defense of the entire suit as long as at least one claim is potentially covered by the policy." *Post v. St. Paul Travelers Ins. Co.,* 691 F.3d 500, 517-18 (3d Cir. 2012). It remains true that "policy exclusions are to be construed narrowly in favor of coverage." *Mut. Benefit Ins. Co. v. Politsopoulos*, 115 A.3d 844, 852 n. 6 (Pa. 2015).

## B. Insurance Policies Are Contracts

The legal principles governing this Court's interpretation of the Policies at issue are well settled. Under Pennsylvania law, the "'interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the Court.'" *Gardner v. State Farm Fire and Cas. Co*., 544 F.3d 553, 558 (3d Cir. 2008) (citing *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).

Since an insurance policy is a contract, the Court's duty is to ascertain the intent of the parties as manifested in the language of the agreement. *Eastern Associated Coal Corp. v. Aetna Cas. & Sur. Co.*, 632 F.2d 1068, 1075 (3d Cir. 1980). A policy must be read as a whole and its meaning construed according to its plain language. *Meyer v. CUNA Mut. Ins. Soc*., 648 F.3d 154, 163 (3d Cir. 2011).

Whether an ambiguity exists is a question of law. *Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 419 (3d Cir. 2011). The Court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits, and should not torture the language of the policy to create an ambiguity. *Eastern Associated Coal Corp.,* 632 F.2d at 1075.

Under Pennsylvania law, an insurance contract is ambiguous where it: "(1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning." *Lawson v. Fortis Ins. Co.*, 301 F.3d 159, 163 (3d Cir. 2002).

When policy language is clear and unambiguous, the Court is required to enforce that language. *Medical Protective Co. v. Watkins*, 198 F.3d 100, 103 (3d Cir. 1999)(citing *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)). Importantly, when the policy language is ambiguous, it must be construed against the insurer, and in favor of the insured, and any reasonable interpretation offered by the insured must control. *American Auto. Ins. Co. v. Murray*, 658 F.3d 311, 321 (3d Cir. 2011).

Under Pennsylvania law, while the insured has the initial burden of establishing coverage, once coverage is established, the insurer must prove an exclusion applies. "Where an insurer relies on a policy exclusion as the basis for its denial of coverage and refusal to defend, the insurer has asserted an affirmative defense and, accordingly, bears the burden of proving such defense." *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006) (quoting *Madison Constr. Co.*, 735 A.2d at 106). Exclusions are construed strictly against the insurer and in favor of the insured. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 206–07 (3d Cir. 2001).

The Second Amended Complaint alleges a claim for "bodily injury" caused by an "occurrence" potentially covered by the Netherlands and Peerless Policies. Both Policies define "bodily injury" to include, *inter alia*, physical injury, sickness, or disease. The Second Amended Complaint specifically alleges, *inter alia*, physical injury from the direct exposure to and/or ingestion of water that was toxic and that Plaintiffs were injured due to the presence of lead and/or copper.

"Generally, injuries caused by negligence are considered to be the result of 'accidents' within the meaning of insurance policies, and correspondingly, negligence claims do not fall within policy exclusions for injuries 'expected or intended' by the insured. That is, negligence is generally covered by the insurance policy." *Allstate Prop. & Cas. Ins. Co. v Fischer*, 2013 WL 6145248, at *4 (E.D. Pa. Nov. 20, 2013)(citing *State Farm Fire & Cas. Co., v. Corry*, 324 F.Supp.2d 666, 672 (W.D. Pa. 2004))(allegations made in joinder complaint sounding in both intentional tort and negligence required the insurer defend).

Here, because the Second Amended Complaint in the Tait litigation alleges that the "bodily injury" allegedly sustained by the Tait Plaintiffs was caused by the negligence of the Insureds, the Insureds have met their burden of establishing coverage under the Policy. Therefore, the Insurers now have the burden of establishing the application of Policy exclusion.

## C.  Because the Pollution Exclusions Are Ambiguous There Is a Duty to Defend

To summarize, the "pollution" exclusions in the Netherlands Policy and the Peerless Policy only excludes coverage for "bodily injury" if it arises out of "the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants.'" (See Compl. at Ex. B.)

Pursuant to the definitions in the CGL Coverage Form in the Netherlands Policy, and the CUL Coverage Form in the Peerless Policy, "pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned, or reclaimed." Doc. 1-2, 1-3 and 1-5.

Both the Netherlands and Peerless policies contain exclusionary language relative to lead that excludes coverage for "Bodily injury . . . arising, in whole or in part, either directly or indirectly out of the mining, processing, manufacture, storage, distribution, sale, installation, removal, disposal, handling, inhalation, ingestion, absorption, use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials; . . ." Doc. 1-3 and 1-5.

Although the Netherlands Policy contains specific exclusions relative to the ingestion of or exposure to lead, importantly, there are no corresponding exclusions for copper. The Pollution Exclusions are ambiguous in the context of an alleged exposure to lead and/or copper in drinking water; and therefore, must be interpreted in favor of coverage.

Although there is no directly applicable factual scenario, both the Supreme Court of Pennsylvania and the Superior Court of Pennsylvania have ruled that standard pollution exclusion language like that contained in the Policies at issue does not apply to a substance such as lead that is a component of a product that degrades over time rendering the substance incrementally bioavailable.  These findings are similar to the facts, as here, where lead and copper are essentially components of the water system at Summit Elementary, which have degraded over time, thereby allegedly rendering the lead and copper bioavailable.

Specifically, in *Lititz Mut. Ins. Co. v. Steeley*, 785 A.2d 975 (Pa. 2001), the only case involving allegations of injury due to lead-based house paint, the Supreme Court of Pennsylvania

found that lead-based house paint, and the means by which the lead in that paint became bioavailable for human exposure, did not fall within the scope of the pollution exclusion language – i.e., household lead exposure does not result from the "discharge, dispersal, seepage, migration, release or escape" of lead. *Accord Fayette Cty. Hous. Auth. v. Hos. & Redevelopment Ins. Exch.*, 771 A.2d 11 (Pa. 2001).

In *Steely*, the Court surmised that "the critical question is whether the process by which lead-based paint becomes available for human ingestion/inhalation unambiguously involves a type of motion that can be characterized as a discharge, dispersal, release, or escape." *Steely*, 785 A.2d at 981. Critically, the Court recognized that it was not capable of answering that question from the four corners of the complaint, instead requiring expert analysis of the mechanisms that render lead bioavailable for inhalation.

In order to determine the applicability of the pollution exclusion language, the Court specifically considered "whether the exclusion's requirement of a 'discharge, dispersal, release or escape' of pollutants is . . . , with reference to the process by which lead-based paint becomes available for ingestion and inhalation, unambiguous." *Id*. at 980–81. "[I]n determining whether there has been a discharge, dispersal, release, or escape, it is necessary to assess the specific form of movement in question." *Id.* at 981.

In *Steely*, the Court considered affidavits which were submitted in support of summary judgment by a toxicologist, and lead paint expert. The Court observed that the experts explained that the lead exposure was the result of a continuous and slow rate of degradation, which was at odds with the "natural, plain and ordinary meaning of the exclusionary language." *Id.* The Court reasoned that "[o]ne would not ordinarily describe the continual, imperceptible, and inevitable deterioration of paint that has been applied to the interior surface of a residence as a

discharge ('a flowing or issuing out'), a release ('the act or an instance of liberating or freeing'), or an escape ('an act or instance of escaping')." *Id.* at 982, *citing* Madison, 735 A.2d at 108. The Court observed that "such deterioration could be understood to constitute a 'dispersal,' the definition of which ('the process . . . of . . . spreading . . . from one place to another,') may imply a gradualism not characteristic of the other terms." *Id.* However, nonetheless, the Court concluded that "[a]ny such inconsistency in meaning simply indicates . . . that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous." *Id.* Because the Court found an ambiguity, the Supreme Court of Pennsylvania held that such ambiguity "requires that the language be interpreted in favor of the insured" and "that the pollution exclusion clause does not preclude coverage for the injuries alleged to have occurred in this case." *Id.*

Later, in *Mistick, Inc. v. Nw. Nat. Cas. Co.,* 806 A.2d 39 (Pa. Super. Ct. 2002), the Superior Court of Pennsylvania, addressing the lessons of *Steely*, stated:

> Our Supreme Court has defined "seepage" as "'the process of seeping,' that is, 'flow[ing] or pass[ing] slowly through fine pores or small openings.'" See *Madison Const. Co.*, 735 A.2d at 108. (*quoting* Webster's Ninth New Collegiate Dictionary (1990)). Thus, "seepage" contemplates the movement of fluid substances.
>
> \*     \*     \*
>
> The remaining manner of movement described by Northwestern's policy is "migration." Northwestern argues that this term, coupled with the provision's broad time reference ("at any time"), contemplates the gradual movement described by the Supreme Court as typical of lead paint and absent from the policy language in [Steely]. Again, we disagree. "'Migration' is 'move[ment]' from one country, place, or locality to another' or 'chang[ing] position in an organism or substance.'" *Madison Const. Co. v. Harleysville Mutual Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 108 (*quoting* Webster's Ninth New Collegiate Dictionary (1990)). We acknowledge that this broad definition of movement may be sufficiently encompassing to include the gradual chipping of lead-based paint from the wall of a home. Nevertheless, like the term "dispersal," that our Supreme Court discounted in [Steely], "migration" is a vague and general term inconsistent with the other terms used in the exclusion, i.e. discharge,

release, seepage and escape. The provision's additional language, "at any time," on which Northwestern relies to establish "gradualism," does not ameliorate this ambiguity. Indeed, this phrase modifies the enumerated modes of movement by reference to a position in time, not duration of time. See Webster's Ninth New Collegiate Dictionary (1990) (defining "at" as a preposition "5-used as a function word to indicate age or position in time"). Accordingly, "discharge, dispersal, seepage, migration, release or escape of pollutants *at any time*" describes the point in time at which movement occurs and does not expand or vary the quality of the described movement. Thus, "migration . . . at any time" is no more gradual than "migration" unmodified. Consequently, we conclude, in accord with [Steely], that the inconsistency in meaning created by reference to migration "simply indicates, . . . that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous." [Steely], 785 A.2d at 981. Such a clause cannot be the basis for an exclusion from coverage under a policy of insurance.

*Mistick*, 806 A.2d at 44.

In order to undertake a determination relative to the particular movement of lead and copper alleged in the Tait litigation, this Court would be required to analyze expert reports and/or affidavits. Such an analysis would require this Court to step outside of the four corners of the operative Complaint, which would be an improper exercise at this juncture. The Supreme Court of Pennsylvania emphasizes that an insurer's duty to defend is broader that its duty to indemnify and that the duty to defend is a distinct obligation, separate and apart from the insurer's duty to provide coverage. *Post*, 691 F.3d at 517. As those set forth in *Steely* and *Mistick*, the pollution exclusion at issue here is ambiguous.[9]

**D. <u>Lead Exclusion Does Not Preclude Coverage of Claims of Injury Due to Copper</u>**

The Insurers argue that the exclusionary language in the Policies preclude coverage for "Bodily injury", . . . arising, in whole or in part, either directly or indirectly out of the . . .

---

[9] The Insurers rely on *Hussey Copper, Ltd. v. Arrowood Indem. Co.*, 391 F. App'x 207 (3d Cir. 2010). However, this Court finds that the "pollution exclusion" in *Hussey* is dissimilar from the "pollution exclusion" in this case because it contains none of the operative terms as explained in *Steely, Fayette Cty Hous. Auth.* or *Mistick*.

inhalation, ingestion, absorption, use or existence of, exposure to, or contact with lead or lead contained in goods, products or materials; . . ."

The Insurers acknowledge that, while there are no reported decisions in Pennsylvania interpreting or applying a lead exclusion, "case law applying policy exclusions with 'in whole or in part' language *overwhelmingly* holds that coverage is barred if any part of the alleged damage resulted from an excluded cause . . . ." Doc. 35 at 12 (emphasis added).[10]  In support of the Insurers' position that the exclusion bars coverage and a duty to defend, the Insurers cite to *Comprehensive Microfilm and Scanning Services, Inc. v. Main Street America Group*, 2012 WL 1339435 (M.D. Pa. April 18, 2012), an unreported case in which the District Court granted summary judgment to the Insurer based upon certain exclusions, including  an intellectual property exclusion, which specifically stated an exclusion for "any *'suit' seeking damages* arising, in whole or in part, out of any allegation of infringement."  *Comprehensive Microfilm*, 2012 WL 1339435, at * 7.

This Court finds that the language of the exclusion in *Comprehensive Microfilm* is distinguishable from the present case because the language of the exclusions at issue here does not specifically state in the same clause that coverage is excluded for a "suit seeking damages arising out of, in whole or in part, lead"; rather, the exclusionary language relates to "*bodily injury* . . . arising, in whole or in part, . . .on lead."

Although Plaintiffs in the Tait litigation have pled injuries resulting from lead and/or copper, there has been no finding at this juncture, nor should there be such a finding without a jury trial, that the lead, in fact, caused, in whole or in part, Plaintiffs' bodily injuries.

---

[10] The three cases cited by the Insurers at doc. no. 35 (two being outside of this Circuit, two  being unpublished, and none constituting binding precedential authority) do not convince this Court that there is an "overwhelming" swath of authority on this topic.

The Insureds instead point out the observations of the Superior Court of Pennsylvania, in *Penn-Am. Ins. Co. v. Tomei*, 2016 WL 2990093 (Pa. Super. Ct. May 24, 2016), that "[t]he phrase 'arising out of' in insurance contracts has generally been interpreted as 'causally connected with' and is construed against the insurer as the drafter of the insurance agreement." *Tomei*, 2016 WL 2990093, at \*4–5. The Insureds go on to emphasize that "Pennsylvania's law requires that exclusions be strictly and narrowly interpreted to favor coverage for the insured." *Gen. Refractories Co. v. First State Ins. Co.,* 94 F. Supp. 3d 649, 659 (E.D. Pa. 2015) (citations omitted); see also *Mut. Benefit Ins. Co. v. Politsopoulos*, 115 A.3d 844, 852 (Pa. 2015) ("policy exclusions are to be construed narrowly in favor of coverage"). The requirement that exclusions be narrowly construed extends to the phrase "arising out of" as used in an exclusionary provision.

The Insureds posit that authority exists for the proposition that where the phrase "arising out of" appears in an *inclusionary* clause, it means causally connected with. However, in an *exclusionary* clause, reading the exclusion strictly against the insurer, it means proximately caused by – an interpretation "consistent with the general rule that insurance policies are read to effect the policy's dominant purpose of indemnity or payment to the insured." *Petrosky v. Allstate Fire & Cas. Ins. Co*., 141 F. Supp. 3d 376, 388 (E.D. Pa. 2015), (quoting *Eichelberger v. Warner*, 434 A.2d 747, 752 (Pa. Super. Ct. 1981), citing *Manufacturers Cas. Ins. Co. v. Goodville Mut. Cas. Co*., 170 A.2d 571, 573 (Pa. 1961)). See also, *General Refractories Company v. First State Insurance Co*., 855 F.3d 152, 159-60 (3d Cir. 2017) (noting that the phrase "arising out of" requires "but for" causation).

Therefore, the lead exclusions in the Netherlands and Peerless Policies must be narrowly construed in favor of coverage and must be read to exclude coverage for a claim

proximately caused by lead. To reiterate, we are far from the juncture of determining "but for" cause and/or proximate cause.

Based upon a reading of the four corners of the Second Amended Complaint filed in the Tait litigation, and comparing these facts as alleged to the four corners of the Policies, and taking the facts in the Second Amended Complaint as true, there are allegations of potential injury from copper that are not dependent on lead injury nor stem from lead injury. Copper is potentially a separate and distinct cause of injury, and the Second Amended Complaint further cites to separate studies setting forth effects of lead and of copper in drinking water on children. See doc. 28 at ¶ 31, fn. 1 at 17-cv-00182.

## V.    Conclusion

The Court will not countenance the Insurers' invitation to turn Pennsylvania law relative to the duty to defend on its head, so as to allow the potential exclusion of a single type of claim to relieve them of their duty to defend, when the law actually requires a defense when a single potentially covered claim is alleged.

Moreover, this Court declines the Insurers' request to look to the "clear focus of the original Complaint" (doc. 32-1 at fn. 1), or at the number of times copper is mentioned in any particular version of either the Original, the First Amended, or the Second Amended Complaint, as the duty to defend standard does not incorporate a "focus" or "numerosity" requirement. Instead, the fact remains that even the first version of the Complaint, and the two subsequent iterations thereafter, contained factual allegations regarding injury solely due to copper, which triggered the duty to defend.

In conclusion, the Court is mindful that an insurer is obligated to defend its insured if the factual allegations of the complaint on its face encompass an injury that is actually or *potentially*

22

within the scope of the policy.  *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.,* 606 Pa. 584, 596 (Pa. 2010).  "As long as the complaint 'might or might not' fall within the policy's coverage, the insurance company is obliged to defend." *Id.* at 609 (citations omitted).

For these reasons, the Court will GRANT the Insureds' Motions for Judgment on the Pleadings (docs. 21 and 22), and DENY the Insurers' (doc. 24).  An appropriate Order follows.


**SO ORDERED** this 9th day of June, 2017.

s/Arthur J. Schwab
Arthur J. Schwab
United States District Judge